**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PCC AIRFOILS, LLC, | ) | |
| 3401 Enterprise Parkway, Suite 200 | ) | CASE NO. 1:25-cv-917 |
| Beachwood, OH 44122 | ) | |
| | ) | |
| *Plaintiff,* | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| JUSTIN DAUGHERTY, | ) | |
| 426 Falls Road | ) | |
| Chagrin Falls, OH 44022 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CONSOLIDATED PRECISION | ) | |
| PRODUCTS, | ) | |
| 1621 Euclid Avenue, Suite 1850 | ) | |
| Cleveland, OH 44115 | ) | |
| | ) | |
| *Defendants.* | ) | |

**VERIFIED COMPLAINT**

Plaintiff PCC Airfoils, LLC ("PCC"), by and through undersigned counsel, hereby files its

Verified Complaint against Defendants Justin Daugherty ("Daugherty") and Consolidated

Precision Products ("CPP") (collectively, the "Defendants") and states as follows:

**PRELIMINARY STATEMENT**

1.      PCC brings this action because Daugherty, one of its most senior and highly

compensated engineers, abruptly left PCC after 26 years to work for CPP – a direct competitor of

PCC – as its Director of Engineering in the aerospace, aviation, and industrial turbine industry.

Daugherty's new role at CPP is so similar to the role he held at PCC, namely because he will be

working on high-level engineering tasks related to the design and manufacture of industrial

turbines, that he will inevitably use and rely on PCC's critical confidential and proprietary

1

information and trade secrets.  Specifically, Daugherty knows so much about PCC's Industrial Gas Turbine ("IGT") casting technology and the ways that PCC sells that technology that he cannot do his Director of Engineering role at CPP without using those trade secrets.

2.     CPP no doubt hired Daugherty in order to obtain the knowledge he gained concerning PCC's specific IGT methodologies and processes while working his way up the ranks at PCC. Daugherty's expertise regarding IGT casting technology was critical to PCC. They would also be critical to CPP. As such, CPP will unfairly benefit from Daugherty's use of PCC's hard-earned confidential and proprietary information and trade secrets without having to do the work or make the investment themselves.

3.     Consistent with his importance to PCC, Plaintiff made Daugherty one of the highest-paid engineering managers at PCC, paying him over $600,000 in 2024.  In return, PCC expected that Daugherty would comply with the Confidentiality and Innovation Assignment Agreement (the "Agreement," attached hereto as Exhibit A) that he executed in 2012.  Daugherty has taken a position at CPP wherein he will certainly use the confidential information protected by the Agreement. In fact, Daugherty gave himself a refresher course on PCC's highly confidential cost information mere days before resigning, almost certainly so that information would be fresh in his head when he started working for CPP.

4.     PCC and CPP are direct competitors in the field of manufacturing blades and other highly engineered parts for the aerospace, aviation, and industrial turbine business.  They compete for the same limited number of customers, including GE Vernova ("GEV") and Siemens.  Given this dynamic – an industry with a limited number of players and customers wherein technical knowledge is critical and small innovations can make a major difference – this is exactly the situation in which the application of the inevitable disclosure doctrine is appropriate.

5.      PCC sought to reach a resolution with Defendants, making clear that its only concern is Daugherty performing an engineering role in the area of IGT casting technology.  It has no problem with Daugherty working in other areas for CPP.  Defendants refused any efforts at compromise, thus making clear that CPP's intention is not to hire Daugherty for his general skills as an engineer but rather specifically his knowledge of IGT casting technology, all of which he acquired at PCC.

6.      Defendants' concerted efforts to contravene Daugherty's contractual obligations to PCC and to misappropriate PCC's most confidential and proprietary technology will irreparably harm PCC, diminish the value of PCC's confidential and proprietary information and trade secrets, and unfairly undermine PCC's competitive edge in the IGT industry. Defendants' unlawful activities should therefore be immediately enjoined.

## PARTIES

7.      Plaintiff PCC Airfoils is a limited liability company with its principal place of business at 3401 Enterprise Parkway, Suite 200, Beachwood, Ohio 44122.

8.      PCC manufactures, sells, and distributes high temperature airfoils, turbine blades, vanes, and other products used in the aerospace, aviation, and power generation industries.

9.      Defendant Daugherty is a natural person and citizen of the State of Ohio, who, upon information and belief, resides at 426 Falls Road, Chagrin Falls, Ohio 44022.

10.      Daugherty is a former employee of PCC who most recently held the title of Engineering Manager of PCC's operations at the  Mentor, Ohio plant.

11.      CPP is a Delaware Corporation registered to do business in Ohio and with its corporate office at 1621 Euclid Avenue, Suite 1850 Cleveland, Ohio 44115.

12.      CPP is a direct competitor of PCC.

FP 54701767.11

13.    On April 21, 2025, Daugherty voluntarily left PCC to work for Defendant CPP – a direct competitor of PCC. Upon information and belief, Daugherty now works in a high-level role at CPP, with the title "Director of Engineering."

## JURISDICTION AND VENUE

14.    Original jurisdiction over this matter exists pursuant 28 U.S.C. § 1331 because PCC asserts a cause of action arising under federal law under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*. Further, the Court has supplemental jurisdiction over PCC's state law claims pursuant to 28 U.S.C. § 1367.

15.    This Court has personal jurisdiction over Daugherty because he resides in Ohio.

16.    This Court has personal jurisdiction over PCC because it has a corporate office in Ohio and conducts business in Ohio.

17.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims against Defendants occurred in the Northern District of Ohio. Venue is also proper under 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the Northern District of Ohio.

## ALLEGATIONS OF FACT
### PCC's Turbine Component Manufacturing Business

18.    PCC has serviced customers in the aerospace, aviation, power generation, and industrial turbine industries since 1986. PCC manufactures complex and highly technical investment castings for turbine engine applications used in jet aircraft engines and industrial gas turbines. PCC operates multiple manufacturing sites in the United States, Mexico, and England.

19.    PCC's plant in Mentor, Ohio, where Daugherty worked during his entire 26-year tenure at PCC and where he was last employed as the Engineering Manager, makes IGT products for land-based turbine applications for power generation. The Deer Creek, Oregon facility that

Daugherty also managed principally manufactures Equiax Vane and Nozzle segments for the IGT industry, which are also used in land-based turbine applications for power generation operations.

20.     As a manufacturer, PCC's success and competitive position in the industry depend on the unique and proprietary products that it makes, which entail substantial engineering investments to maintain a competitive position relative to its commercial rivals.

21.     PCC collaborates with its individual customers to manufacture components that meet their specifications. Meeting these specifications requires the investment of substantial time and monetary resources and would not be possible without PCC's accrued engineering expertise in the industry.

22.     PCC invested, and continues to invest, substantial time and monetary resources to develop its products and technology, and, as a result is recognized as a leading producer of these components. PCC has developed highly automated casting furnaces and investment casting processes for the manufacture of blades and vanes. PCC has made significant process development with ceramic cores, solidification technology, computer modeling and inspection methods, all of which assure its continued strength in this market.

23.     The information, technologies, and methodologies that PCC developed are valuable, confidential, and proprietary to PCC; are not readily available to PCC's competitors or the public; have significant economic value to PCC; and would be of significant economic value to its competitors.

24.     PCC relies on a network of well-trained engineers to develop and manufacture its products, including its IGT casting technology, for its clients around the country. To work effectively, PCC's engineers must have intimate knowledge of PCC's confidential, proprietary, and trade secret information that: (a) derives independent actual and potential economic value from

not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is, and at all material times was, the subject of efforts reasonable under the circumstances to maintain their secrecy. Such information is hereinafter referred to as PCC's "Trade Secrets."

25. The Trade Secrets include, but are not limited to:

a. Wax formulations, processing parameters, wax tooling design, wax pattern injection methods, and core placement methods;

b. Ceramic formulations, ceramic processing parameters, equipment designs for molds, de-waxing methods and equipment, firing parameters, mold designs and materials, inspection methods, and process control strategies and methods;

c. Equipment and parameters for master metal, knowledge of minor composition variations on alloy performance, filtration techniques, pouring methods, refining methods, and internal specification ranges;

d. Casting parameters and processes, design methods for casting furnaces and configuration and furnaces, techniques to control thermal gradients, process parameters and measurement methods, specific process control strategies and methods, liquid metal cooling process and equipment, and single crystal and directionally solidified casting process technology;

e. Tooling methods and procedures, core removal equipment and methods, heat treatment parameters, gauging methods and analysis of date, cut-off methods, and finishing techniques;

f. Tooling design criteria, tooling manufacturing methods, shrink factors, gating methods, and rapid prototype tooling technology;

6

g.  Research projects and process evaluations, including evaluation and knowledge of what processing methods should and should not be used; and

h.  Confidential and proprietary financial business information, including, but not limited to, product pricing and costs, financial statements, quarterly financial reports, customer lists and information, long-term agreements with customers and suppliers, business plans, acquisition and divestiture planning and strategy, operating information, and new facility start-up information.

26.  PCC's engineers develop and work with the aforementioned knowledge through their employment with PCC, including by working closely with PCC's customers regarding their technical and other needs and being granted access to confidential information and documents as a result of their employment.

27.  PCC uses reasonable measures to protect and maintain the secrecy of its confidential information and Trade Secrets, including, but not limited to password-protecting databases and other IT security measures; requiring employees, like Daugherty, to sign confidentiality and non-disclosure agreements; physical security at its plants; and limiting the dissemination of information to employees on a need-to-know basis.

**Daugherty's Employment with PCC**

28.  Daugherty started his career with PCC in 1998 as a Product Engineer at the Mentor, Ohio plant. Upon information and belief, prior to joining PCC, Daugherty did not have experience with IGT casting technology.

29.  In the 26 years he worked for PCC, Daugherty received several promotions into leadership and managerial roles. For example, in 2007, Daugherty received a promotion to Engineering Team Lead and an increase in compensation. In 2013, he received another rate

7

increase. Daugherty achieved the title of Engineering Manager in 2014 and his salary increased to $97,000 annually. In 2015, he received another pay increase, and three years later, his position changed to Front End Operations Manager. PCC promoted Daugherty into another leadership position – Director of Engineering, responsible for both PCC Mentor and PCC Deer Creek, Oregon location in 2020 with his salary increasing to $200,000 annually. Daugherty became the Engineering Manager solely for PCC Mentor in 2022 until his resignation.

30. In that position, he was responsible for managing the Engineering Department at the Mentor, Ohio location.

31. In his various engineering and leadership roles, Daugherty received training on and became intimately familiar with PCC's Trade Secrets, especially those associated with its IGT casting technology.  Indeed, he was critical in developing those technologies on behalf of PCC.

32. Daugherty had intimate knowledge concerning the ways PCC is using and developing IGT technology to better serve its customers. Daugherty learned about those offerings already in the market as well as those under development. In short, he had the highest levels of exposure to the most important technological information at PCC and he worked with this information daily.

33. Daugherty has specific, proprietary knowledge about PCC's low pressure (LP) core technology relating to IGT blades, a process that involves injecting ceramic material into core die and then making a casting around that core.  This evolving technology of how the LP core interacts in the casting process has become a differentiating factor between PCC's turbine blades and those of its competitors, including CPP.  As a result, PCC has achieved an advantageous position in the market for IGT blades, generating revenue of well over $250 million per year.

34. Because of the importance of his role, PCC compensated Daugherty handsomely. In fact, in his last full year with PCC, Daugherty received compensation totaling $651,947.67, making him the highest-paid Engineering Manager at PCC.

35. At the outset of his employment, Daugherty executed a broad Non-Disclosure and Invention Agreement, dated September 28, 1998.

36. On April 2, 2012, in consideration of his continued employment with PCC, Daugherty executed the Agreement. In reliance on his contractual commitments, PCC continued to expose Daugherty to a substantial amount of highly confidential information and trade secrets, as well as key customer relationships.

37. In Section 2 of Agreement, Daugherty acknowledged that PCC owns certain proprietary information and that he might acquire proprietary information owned by PCC though his employment. He also agreed not to disclose PCC's proprietary information except as necessary for his work with PCC. Section 2 provides:

> **2. Proprietary Information**
> a. The Company owns, develops and acquires Proprietary Information, which may include information that I acquire, develop, or discover as a result of my employment with the Company ("Employment"). During and after my Employment, (i) I will not disclose any Company Proprietary Information outside the Company, and (ii) I will not use any Company Proprietary Information except as necessary in connection with my work for the Company. I hereby assign to the Company any rights I may have or acquire in such Company Proprietary Information and recognize that all Company Proprietary Information shall be the sole property of the Company and its assigns.

(Ex. A, § 2.a.)

38. The Agreement defines PCC's "Proprietary Information" as "information, of any nature and in any medium, that derives actual or potential independent economic value from not being generally known to the public or to people who can gain economic value from it, and any

information that the Company is obligated to keep confidential." (Ex. A, § 1.) This information includes, but is not limited to, customer lists, prices, company policies and procedures, special metal specifications and metal melting and pouring techniques, dewaxing techniques, wax formulations, and heat treatments.

39.     In Section 3 of the Agreement, Daugherty also agreed to, upon the end of his employment or upon request from PCC, "destroy or deliver to the Company as instructed, all materials furnished to [Daugherty] by the Company and all copies of materials containing Company Proprietary Information." (Ex. A, § 3.)

40.     Daugherty further promised to refrain from "directly or indirectly, during [his] Employment and for a period of two years thereafter solicit, divert or hire away [or attempt to] any person who, within the six-month period prior to such solicitation, was an employee of the Company..." (*Id.* § 5.)

41.     Pursuant to Section 8.a. of the Agreement, the parties agreed that PCC would be entitled to injunctive relief against Daugherty in the event that Daugherty violated its terms:

> **Injunctive Relief.** A breach of this Agreement will result in irreparable harm to the Company for which there is no adequate remedy at law, and the Company is entitled to injunctive relief and specific performance. The Company need not post a bond or other security to enforce its rights under this Agreement.

(*Id.* § 8.a.)

42.     Finally, the parties agreed that Ohio law governs the interpretation of the Agreement without reference to conflicts of law rules. (*Id.* § 8.f.)

FP 54701767.11

### **Daugherty's Move to CPP and Disregard of His Obligations**

43.     On April 16, 2025 (three business days before his resignation), Daugherty accessed at least 11 documents containing cost information that relates to IGT bids that PCC won in late December 2022.  The bids related to GEV and Siemens.

44.     The parts reflected in the documents accessed by Daugherty are associated with a major capital expenditure on the part of PCC and are cutting edge parts for future power generation needs.

45.     Daugherty had no legitimate business reason to access these files, which reflect PCC's internal analysis regarding its costs associated with certain engineering work and can therefore be used to divine PCC's methodology for setting prices on competitive work, as well as its engineering process.

46.     Even assuming for the sake of argument that Daugherty did not print or take pictures of this cost data, the fact that he gave himself a refresher course on PCC's methodologies regarding costs associated with IGT bids right before resigning reflects that he intends to use that information on behalf of CPP.

47.     CPP makes competitive versions of the parts reflected in the documents that Daugherty was accessing en masse on April 16, 2025.  Upon information and belief, part of CPP's reason in hiring Daugherty as its new Director of Engineering is to work on CPP's process for engineering the parts reflected in the documents accessed by Daugherty on April 16, 2025.

48.     On April 21, 2025, Daugherty sent an email notifying PCC of his acceptance of a position with a competitor of PCC and resigning his employment. After he tendered his resignation, PCC terminated Daugherty's employment on that same day.

11

49.     Upon information and belief, shortly after his resignation, Daugherty began working for CPP as its Director of Engineering at its offices in Cleveland, Ohio.

50.     Daugherty's role as the Director of Engineering at CPP almost certainly involves many of the same duties and responsibilities as his former work with PCC, including, but not limited to, the engineering of solutions related to IGT casting technology and related turbine products.

51.     Upon information and belief, in his role as the Director of Engineering at CPP, Daugherty is using, and will continue to use, technical knowledge, including his extensive knowledge of IGT casting technology, that he developed through his work with PCC.  Indeed, his knowledge of PCC's IGT casting technology is so deep that he cannot possibly perform work on CPP's competitive IGT casting technology without calling on the 26 years of trade secret knowledge that he obtained at PCC.

52.     Daugherty not only poses an unacceptable risk of using PCC's trade secret information regarding the engineering and development of its IGT casting technology, but he will also be able to prevent CPP from going down paths that he will know from his time at PCC are fruitless.

53.     PCC and CPP are direct competitors in the business of providing IGT blades in the aerospace and turbine markets. They manufacture many products for common customer needs and they compete for many of the same customers in a field with relatively few players because of high barriers to entry.

54.     CPP is a global casting supplier with facilities across the United States, Mexico and Europe, offering a wide range of products on both airframes and engines.

12

55.     As shown on its website, CPP also manufactures multiple components, such as vanes, blades, shrouds and diffuser casings, for the IGT market in support of power generation:



56.     PCC and CPP also routinely compete with one another for market share pertaining to the limited universe of customers with needs for castings used in aircraft or industrial turbines, especially GEV and Siemens.

57.     As the Director of CPP's Engineering Department, Daugherty is able to compete unfairly in the IGT market against PCC because he is intimately familiar with PCC's Trade Secrets associated with its IGT casting technology, such as the ways that PCC is using and developing IGT technology to better serve its customers, and PCC's offerings already in the market as well as those under development.  Daugherty also has knowledge concerning PCC's customer lists, prices, company policies and procedures, special metal specifications and metal melting and pouring techniques, dewaxing techniques, wax formulations, and heat treatments.

58.     Specifically, PCC has the largest market share with GEV because of PCC's ability to manufacture and develop highly complex castings for GEV.  Daugherty would pose a specific

risk to PCC's market share with GEV because he would inevitably disclose PCC's intellectual property to manufacture such complicated castings.

59.     When PCC learned of Daugherty's new employment, it had grave concerns that Daugherty posed an unacceptable threat to compete unfairly now that he occupies a high-level engineering position with CPP like the one he held when he resigned from PCC.

60.     PCC, through counsel, sent separate letters to Daugherty and CPP on April 22, 2025, reminding/notifying them of Daugherty's confidentiality obligations under the Agreement as well as state and federal trade secret law. True and correct copies of these letters are attached as **Exhibit B** (Daugherty Letter) and **Exhibit C** (CPP Letter).

61.     In the April 22, 2025 letter to Daugherty, PCC requested that he:

- provide a detailed job description of his job duties at CPP;
- detail in writing how his job duties at CPP are sufficiently different that he would not use or disclose PCC's Trade Secrets;
- disclose in writing what guardrails have been put in place to avoid use of PCC's Trade Secrets or confidential information;
- commit that he would not work on any IGT casting technology on behalf of CPP; and
- affirm that he would comply with the remaining obligations in the Agreement.

(*See, e.g.,* Ex. B, p. 3.)

62.     However, Daugherty and CPP made no such assurances.  They have refused to divert Daugherty from the niche area that he occupied for PCC for decades: engineering related to IGT casting technology, stating "CPP will not prohibit Justin Daugherty from providing services to CPP relating to IGT technologies."  (See **Exhibit D**.)

63.     The fact that CPP insists on employing Daugherty in the field of IGT technology makes clear that it is not hiring him for his "leadership and engineering talent development experience, and Six Sigma and general engineering principles," as all of those would be equally applicable to CPP's other lines of business, areas in which PCC is perfectly fine with Daugherty

14

handling. *Id.* It is hiring him specifically for his trade secret knowledge of PCC's IGT casting technology, an area that he learned exclusively from PCC.

64.    Moreover, CPP has taken no steps whatsoever to ensure that Daugherty does not use PCC's trade secrets and confidential information other than giving him a generic "do not use PCC's trade secrets or confidential information" instruction. *Id.* It has not put up any specific guardrails whatsoever to ensure that its IGT products are not suffused with PCC's trade secrets and confidential information.

65.    CPP has been losing IGT market share to PCC in recert years because of PCC's advantage associated with its LP core technology. CPP almost certainly hired Daugherty to use his knowledge of this technology to narrow a competitive gap.

66.    Thus, to protect its business interests in its Proprietary Information and Trade Secrets, PCC was forced to file this litigation.

67.    Based on Daugherty's current course of conduct, PCC is threatened with immediate and irreparable injury. Daugherty worked as a trusted, high-level employee at PCC, eventually becoming its highest paid engineer. For over two decades, PCC gave Daugherty access to PCC's highly confidential information. PCC paid Daugherty handsomely to develop its IGT casting technology and related turbine products.

68.    Now, PCC faces losing the value of that information, as well as its customer relationships in which it has made a substantial investment.

### COUNT I
### Breach of Contract – Disclosure of Confidential Information
### (Against Defendant Daugherty)

69.    PCC realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

70.     The Agreement is a valid and enforceable contract.

71.     PCC has fully performed its contractual obligations under the Agreement.

72.     The terms of the Agreement do not pose an undue hardship on Daugherty and are not injurious to the public and are no greater than is required for the protection of PCC's legitimate business interests in its Proprietary Information and Trade Secrets.

73.     Pursuant to Section 3 of the Agreement, Daugherty was obligated to refrain from disclosing or using any Company Proprietary Information except as necessary in connection with his work for the Company. The Agreement defines PCC's "Proprietary Information" as "information, of any nature and in any medium, that derives actual or potential independent economic value from not being generally known to the public or to people who can gain economic value from it, and any information that the Company is obligated to keep confidential." (Ex. A, § 1.) This information includes, but is not limited to, customer lists, prices, company policies and procedures, special metal specifications and metal melting and pouring techniques, dewaxing techniques, wax formulations, and heat treatments.

74.     As the Engineering Manager at PCC, Daugherty had access and intimate knowledge of PCC's Proprietary Information and Trade Secrets, such as the ways that PCC is using and developing IGT technology to better serve its customers, and PCC's offerings already in the market as well as those under development.  Daugherty also has knowledge concerning PCC's customer lists, prices, costs, company policies and procedures, special metal specifications and metal melting and pouring techniques, dewaxing techniques, wax formulations, and heat treatments.

75.     Daugherty has violated the Agreement by engaging in the exact action from which he agreed to refrain, namely by accepting a position in a competing business and engaging in a

16

competing business purpose that will inevitably result in his disclosure and use of PCC's Proprietary Information and/or Trade Secrets.

76.     CPP is a direct competitor of PCC. Upon information and belief, given his high-level role as the Director of Engineering at CPP, Daugherty will be responsible for developing CPP's IGT technology and generating revenue, including maximizing CPP's opportunities and strategies to sell its products and services to the very same customers as PCC. Daugherty will necessarily use, disclose, and rely on PCC's confidential information in the course of his duties for CPP and to compete with PCC.

77.     PCC has suffered and will continue to suffer damages as a result of Daugherty's breach of contract, including loss of business and diminished value of its confidential information, goodwill with customers, and loss of its competitive advantage.

78.     PCC's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

79.     PCC has demonstrated that Daugherty, unless restrained, will engage in conduct that breaches the Agreement. PCC is likely to prevail on the merits of this cause of action.

80.     Should this court grant injunctive relief to PCC, the burden on Daugherty would be slight compared to the injury to PCC if it is not granted. No injury to Daugherty would result from an order requiring him to comport his actions under the Agreement. Indeed, the requested injunctive relief is narrowly tailored to prohibit Daugherty from working on any IGT casting on behalf of CPP in the industrial turbine field. Daugherty would still be free to work in other areas at CPP, including aerospace.

81.     Daugherty furthermore agreed injunctive relief would be an appropriate remedy if he breached the Agreement.

FP 54701767.11

82.     The grant of an injunction will not disserve the public interest. Indeed, injunctive relief is consistent with the Agreement between the parties.

## COUNT II
## Misappropriation of Trade Secrets in
## Violation of Ohio Rev. Code § 1333.61, *et seq.*
## (Against All Defendants)

83.     PCC realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

84.     The Ohio Uniform Trade Secrets Act, Ohio Rev. Code §§ 1333.61, *et seq.*, prohibits the actual and threatened misappropriation of trade secrets. Under the Act, a trade secret satisfies both of the following: (1) it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Ohio Rev. Code § 1333.61(D).

85.     Under the Act, misappropriation means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following: (a) Used improper means to acquire knowledge of the trade secret; (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(C).

86.     In connection with the development of its business, PCC expended substantial time and monetary resources to develop its customer lists, prices, company policies and procedures, special metal specifications and metal melting and pouring techniques, dewaxing techniques, wax formulations, heat treatments, proprietary business methods, strategies, technologies, processes, marketing plans, customers, and other proprietary information regarding its casting furnaces and investment casting processes for the manufacture of blades and vanes, ceramic cores, solidification technology, IGT casting technology, computer modeling and inspection methods.

87.     Throughout his employment with PCC, Daugherty possessed and had knowledge of certain confidential and proprietary information of PCC that constitutes trade secrets under the Ohio Uniform Trade Secrets Act. By way of his various engineering and leadership roles, Daugherty became intimately familiar with PCC's Proprietary Information and Trade Secrets associated with its IGT casting technology. For instance, Daugherty was intimately aware as to the ways that PCC is using and developing IGT technology to better serve its customers. Daugherty also learned about those offerings already in the market as well as those under development. Most importantly, Daugherty is intimately aware of PCC's LP core technology associated with IGT blades.  Finally, Daugherty has substantial knowledge regarding PCC's pricing and cost methodology.  In short, he had the highest levels of exposure to the most important technology information at PCC, and he worked with this information daily.

88.     PCC derives economic benefit from the fact that its Trade Secrets, as described above, are not generally known to individuals or entities outside of PCC.

89.     PCC has at all times had a protectable business in its trade secret information and has taken reasonable steps to protect the secrecy of this information. These measures include password-protected databases and other IT security measures, confidentiality and non-disclosure

agreements, physical security, and limitations on dissemination of information on a need-to-know basis.

90.     Daugherty knew he had a duty to maintain the secrecy of PCC's Trade Secrets due to his acknowledgment of such under the first Confidentiality Agreement he signed at the outset of his employment in September 1998, which was reiterated by the Agreement, and in his various engineering and leadership roles at PCC.

91.     CPP is a direct competitor of PCC. Upon information and belief, as the Director of Engineering at CPP, Daugherty is in a position that is substantially similar to the position he held at PCC when he resigned.

92.     Also upon information and belief, as Director of Engineering at CPP, Daugherty will be responsible for developing CPP's IGT technology and generating revenue, including maximizing CPP's opportunities and strategies to sell its products and services to the very same customers as PCC. Daugherty will necessarily use, disclose, and rely on PCC's Trade Secrets in the course of his duties for CPP and to compete with PCC.

93.     There is a very real threat and substantial probability that Daugherty will necessarily use, disclose, and rely on PCC's Trade Secrets in the course of his duties for CPP and to compete with PCC. Daugherty cannot do his job as a Director of Engineering without using, referencing, and disclosing PCC's Trade Secrets.

94.     Upon information and belief, in his role as the Director of Engineering at CPP, Daugherty is using and will continue to use technical knowledge, including his extensive knowledge of IGT casting technology, that he developed through his work with PCC.

95.     CPP has not taken any actions to prevent Daugherty from using or disclosing PCC's Trade Secrets.  CPP's sole safeguard is a perfunctory instruction to Daugherty not to use PCC's Trade Secrets.  Under the circumstances, this action will be completely ineffectual.

96.     Upon information and belief, CPP hired Daugherty as its Director of Engineering to benefit from his knowledge of PCC's Trade Secrets and Proprietary Information, specifically his extensive knowledge of PCC's IGT casting technology.

97.     In light of the similarities between Daugherty's roles at PCC and CPP, and the fact that the companies are direct competitors involved in developing IGT casting technology, Daugherty will inevitably disclose, or continue to disclose, and use PCC's Trade Secrets, in the course of his employment with CPP in his role as Director of Engineering for CPP. Given Daugherty's extensive and longstanding knowledge of PCC's Trade Secrets relating to IGT casting technology, it will be impossible for him to compartmentalize and selectively suppress such information while working for PCC's direct competitor, no matter how well-intentioned his efforts may be to do so.

98.     Given the substantial similarities and the competitive nature of the businesses, as well as Daugherty's high-level roles at both PCC and CPP, Defendants have threatened to improperly acquire, disclose, and use PCC's Trade Secrets without consent of any kind for their own financial gain.

99.     Defendants' actions constitute threatened misappropriation in violation of the Ohio Uniform Trade Secrets Act, and thus may be enjoined by injunctive relief. *See* Ohio Rev. Code § 1333.62(A) ("Actual *or threatened* misappropriation may be enjoined.")

100.    Defendants threaten to misappropriate PCC's Trade Secrets knowingly, willfully, maliciously, intentionally, and in bad faith as to warrant imposing exemplary damages and attorneys' fees in an amount to be determined at trial.

101.    The misappropriation of PCC's Trade Secrets will proximately cause substantial damage and irreparable harm to PCC, including loss of customers, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

102.    PCC is entitled to actual damages from Defendants, jointly and severally, and for attorneys' fees. PCC's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

103.    PCC is entitled to temporary, preliminary, and permanent injunctions against the use, possession, transfer, duplication, and disclosure by Defendants of such proprietary and trade secret information, and against any future development or activities that would or could make use of such proprietary and trade secret information.

104.    Defendants' actions will continue to cause irreparable harm and damages to PCC and its trade secret information if not restrained.

### COUNT III
### Misappropriation of Trade Secrets
### in Violation of 18 U.S.C. § 1836, *et seq.*
### (Against All Defendants)

105.    PCC realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

106.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, this Court may act in equity to enjoin threatened misappropriation of trade secrets.

FP 54701767.11

107.     Throughout his employment with PCC, Daugherty possessed and had knowledge of certain confidential and proprietary information of PCC that meets the definition of a "trade secret" under 18 U.S.C. § 1839(3), which includes:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-
>
> (a) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

108.     PCC's Trade Secrets, as defined above, fit squarely in the definition of the DTSA's definition of trade secrets. In connection with the development of its business, PCC expended substantial time, labor, and money to research and develop its Trade Secrets.

109.     PCC's Trade Secrets derive independent economic value due to their secrecy as they are not generally known and not readily ascertainable through proper means.

110.     PCC's Trade Secrets are related to services used in interstate commerce, as PCC services customers throughout the United States.

111.     PCC has at all times had a protectable business in its trade secret information and has taken reasonable steps to protect the secrecy of this information as required by 18 U.S.C. § 1839(3)(a). These measures include password-protected databases and other IT security measures, confidentiality and non-disclosure agreements, physical security, and limitations on dissemination of information on a need-to-know basis.

112.    PCC provided Daugherty with access to its Proprietary Information and Trade Secrets during the 26 years he worked with PCC. By way of his various engineering and leadership roles, Daugherty became intimately familiar with PCC's Proprietary Information and Trade Secrets associated with its IGT casting technology.

113.    Daugherty knew he had a duty to maintain the secrecy of PCC's Trade Secrets due to his acknowledgment of such under the first Confidentiality Agreement he signed at the outset of his employment in September 1998, which was reiterated by the Agreement, and in his various engineering and leadership roles at PCC.

114.    CPP is a direct competitor of PCC. Upon information and belief, as the Director of Engineering at CPP, Daugherty is in a position that is substantially similar to the position he held at PCC when he resigned.

115.    Also upon information and belief, as Director of Engineering at CPP, Daugherty will be responsible for developing CPP's IGT technology and generating revenue, including maximizing CPP's opportunities and strategies to sell its products and services to the very same customers as PCC. Daugherty will necessarily use, disclose, and rely on PCC's confidential information and Trade Secrets in the course of his duties for CPP and to compete with PCC.

116.    Upon information and belief, CPP hired Daugherty as its Director of Engineering to benefit from his knowledge of PCC's Trade Secrets and Proprietary Information, specifically his extensive knowledge of PCC's IGT casting technology.

117.    There is a very real threat and substantial probability that Daugherty will necessarily use, disclose, and rely on PCC's Trade Secrets in the course of his duties for CPP and to compete with PCC. Daugherty cannot do his job as a Director of Engineering without using, referencing and disclosing PCC's Trade Secrets.

118. Upon information and belief, CPP has not taken any actions to prevent Daugherty from using or disclosing PCC's trade secrets and any such actions would be ineffectual.

119. In light of the similarities between Daugherty's roles at PCC and CPP, and the fact that the companies are direct competitors involved in developing IGT casting technology, Daugherty will inevitably disclose or continue to disclose and use PCC's Trade Secrets, in the course of his employment with CPP in his role as Director of Engineering for CPP. Given Daugherty's extensive and longstanding knowledge of PCC's trade secrets and proprietary IGT casting technology as well as the price and cost information associated with selling IGT products, it will be impossible for him to compartmentalize and selectively suppress such information while working for PCC's direct competitor, no matter how well-intentioned his efforts may be to do so.

120. Given the substantial similarities and the competitive nature of the businesses, as well as Daugherty's high-level roles at both PCC and CPP, Defendants have threatened to improperly acquire, disclose, and use PCC's Trade Secrets without consent of any kind for their own financial gain.

121. Because of the willfulness and maliciousness of Defendants' conduct, PCC is also entitled to exemplary damages.

122. PCC is also entitled to temporary, preliminary, and permanent injunctions, against the use, possession, transfer, duplication, and disclosure by Defendants of such proprietary and trade secret information, and against any future development or activities that would or could make use of such proprietary and trade secret information because PCC has suffered and will continue to suffer imminent harm and irreparable injury as a result of Defendants' misappropriation. The injury to PCC is not accurately measurable and PCC cannot be adequately compensated in damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** PCC prays that this Court will enter judgment in its favor and against the Defendants as follows:

    a. Enter a temporary, preliminary, and permanent injunction order enjoining the Defendants from directly or indirectly using, disclosing, copying, or transmitting PCC's Proprietary Information and/or Trade Secrets;

    b. Enter a temporary, preliminary, and permanent injunction order preventing Daugherty from directly or indirectly providing services to CPP related to or concerning IGT casting technology;

    c. Require Daugherty, as well as all persons acting in concert with him, to return to PCC all property, including computers, and all originals, copies, or other reproductions in any form whatsoever, of any record or document containing, in whole or in part, any confidential information belonging to PCC and any other property belonging to PCC;

    d. Enter judgment for PCC against Defendants;

    e. Award to PCC actual damages (such as lost profits) and disgorgement of amounts by which Defendants were unjustly enriched;

    f. Award to PCC punitive and/or exemplary damages;

    g. Award to PCC prejudgment interest;

    h. Award to PCC its costs and reasonable attorneys' fees incurred in protecting its rights; and

    i. Award such other relief that this honorable Court may deem just and proper.

FP 54701767.11

Respectfully submitted,

s/ Kirsten B. Mooney
Kirsten B. Mooney (0096378)
**FISHER & PHILLIPS LLP**
200 Public Square, Suite 4000
Cleveland, OH 44114
Telephone:  (440) 838-8800
Facsimile:  (440) 838-8805
kmooney@fisherphillips.com

Michael P. Elkon
Georgia Bar No. 243355
(*pro hac vice* admission pending)
Nicole B. Holtzapple
Georgia Bar No. 940598
(*pro hac vice* admission pending)
**FISHER & PHILLIPS LLP**
1230 Peachtree Street, NE – Suite 3300
Atlanta, Georgia 30309
Tel: (404) 231-1400
Fax: (404) 240-4249
melkon@fisherphillips.com
nholtzapple@fisherphillips.com

*Attorneys for Plaintiff*

FP 54701767.11

## **VERIFICATION**

I, Salim Siatkhan, am the Vice President of Operations for PCC Airfoils, LLC, and I am

authorized to make this verification on its behalf. I hereby verify under penalty of perjury that

the facts contained in the foregoing Verified Complaint are true and correct to the best of my

knowledge, information, and belief.

May 6, 2025

_____               _____
Date                                                                    By:     Salim Siatkhan
                                                                                    VP Operations
                                                                                    PCC Airfoils, LLC