UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| PCC AIRFOILS, LLC, | ) | CASE NO.:  1:25-CV-00917 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| JUSTIN DAUGHERTY, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |


Plaintiff PCC Airfoils, LLC ("Plaintiff" or "PCC") moves the Court for a preliminary

injunction.  (Docs. 2, 15.)  Defendants Justin Daugherty ("Daugherty") and Consolidated

Precision Products Corp. ("Consolidated Precision Products") (collectively "Defendants")

oppose the request.  (Docs. 11, 22.)  On July 31, 2025, the Court held an evidentiary hearing.

After the hearing, the parties submitted Proposed Findings of Fact and Conclusions of Law.

(Docs. 34, 35.)  For the reasons stated herein, Plaintiff has not clearly shown it is entitled to

injunctive relief.

I.      **BACKGROUND**

     A.      **Factual History**

          1.      **Daugherty's Tenure at PCC**

PCC manufactures castings for industrial gas turbine ("IGT") airfoils.  (Doc. 33, Hrg. Tr.,

(Sitabkhan) at 964-68.)[1]  A turbine blade is a type of airfoil.  (*Id.* at 950.)  PCC's primary facility

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document

for IGT products is in Mentor, Ohio.  (*Id.* at 964-68.)  The IGT industry is highly concentrated.  (*Id.* at 982-83, 1001, 1010.)  PCC's competitors include Consolidated Precision Products, Howmet Aerospace Inc., Doncasters Group Ltd., and Chromalloy Gas Turbine LLC.  (*Id.*)  PCC is the market leader for IGT airfoils and Consolidated Precision Products ranks third or fourth in terms of market share.  (*Id.* at 982.)  Consolidated Precision Products manufactures IGT airfoils at its plant in Eastlake, Ohio.  (*Id.* (Daugherty) at 1266.)

PCC's manufacturing processes and the documents detailing its processes are trade secrets.  (*Id.* (Sitabkhan) at 964-74.)  The overall IGT casting process includes several stages: wax, ceramics, metal casting, tooling, and inspection.  (*Id.*)  Documented processes are set out in PCC's Standard Operating Procedures ("SOPs").  (*Id.* (Daugherty) at 1205-08.)  PCC's trade secrets also include pricing structures and cost estimates.  (*Id.* (Sitabkhan) at 974; *id.* (Polen) at 1037-38; *id.* (Daugherty) at 1251.)

In 1998, Daugherty joined PCC as a Product Engineer at PCC Mentor.  (*Id.* (Daugherty). at 1198-99.)  After approximately ten years, he was promoted to Engineering Lead.  (*Id.* at 1198-99, 1204.)  Daugherty held that role until about 2013.  (*Id.* at 1205.)  In these roles, Daugherty was responsible for solving various problems with the IGT manufacturing process, including controlling scrap rates and improving yield for each part.  (*Id.* at 1198-99.)  As an engineer at PCC, Daugherty utilized the Six Sigma methodology to solve engineering problems.  (*Id.* at 1200.)  Six Sigma is a non-proprietary problem-solving methodology widely used by engineers.  (*Id.*)

During his entire tenure at PCC, Daugherty never entered into a non-compete agreement with PCC.  (*Id.* at 1198.)  In 2012, Daugherty executed a Confidentiality and Innovation

---

and PageID# rather than any internal pagination.

Assignment Agreement ("Agreement") with PCC.  (*Id.* (Sitabkhan) at 979-80; Plaintiff's Exhibit 1.)  Section 2 of the Agreement provides, "During and after my Employment, (i) I will not disclose any Company Proprietary Information outside the Company, and (ii) I will not use any Company Proprietary Information except as necessary in connection with my work for the Company."  (*Id.*; Doc. 1-1 at 30.)  Section 3 of the Agreement further provides, "When my Employment ends, or when the Company requests, I will destroy or deliver to the Company as instructed, all materials furnished to me by the Company and all copies of materials containing Company Proprietary Information."  (*Id.*)  PCC required Daugherty's replacement to sign a two-year non-compete agreement.  (Doc. 33 (Sitabkhan) at 1008-11; Defendants' Exhibit F.)

In 2013, Daugherty was promoted to Engineering Manager at PCC Mentor.  (Doc. 33 (Daugherty) at 1205.)  As Engineering Manager, Daugherty oversaw the entire engineering group at PCC Mentor.  (*Id.*)  He reviewed and approved SOPs documenting the IGT manufacturing process.  (*Id.* at 1205-08.)  For the last 10 to 12 years, Daugherty reviewed and approved SOPs written by engineers who reported to him.  (*Id.* at 1205-06.)  Daugherty estimated there are over a hundred SOPs that govern the manufacturing process at PCC Mentor, which range from two pages to fifty pages.  (*Id.* at 1207-08.)  Daugherty did not take any SOPs when he left PCC.  (*Id.* at 1208.)  He also did not commit the information to memory.  (*Id.*)

Two former PCC engineers who wrote SOPs under Daugherty's supervision include Rachel Harmon and Chris Miranda  (*Id.* at 1205-07, 1255-57.)  Both left PCC for Consolidated Precision Products.  (*Id.*)  Both had access to PCC trade secrets while at PCC.  (*Id.*)  Both now work with Daugherty at Consolidated Precision Products.  (*Id.*)  To Daugherty's knowledge, PCC did not attempt to stop either Harmon or Miranda from departing for Consolidated

Precision Products.  (*Id.* at 1206-07.)  He does not believe either of them has disclosed PCC's

trade secrets to Consolidated Precision Products.  (*Id.* at 1207.)

Around 2020, Daugherty was promoted to Director of Engineering at PCC.  (*Id.*)  In that

role, he continued to oversee engineering functions at PCC Mentor.  (*Id.* at 1208-09.)  He also

oversaw PCC's IGT facility in Deer Creek, Oregon.  (*Id.* at 1208-10.)  Less than a year later,

PCC restructured.  (*Id.* at 1210.)  Daugherty returned to his prior role as Engineering Manager at

PCC Mentor.  (*Id.*)  He was disappointed with the lack of promotional opportunities at PCC.  (*Id.*

at 1210-13.)  Daugherty expressed his concerns to Salim Sitabkhan, PCC's Vice President of

Operations.  (*Id.* at 1212-13.)

As Engineering Manager, Daugherty was instrumental in developing the Raptor blade.

(*Id.* (Sitabkhan) at 993-95.)  This is a larger IGT blade that is becoming popular among

customers.  (*Id.*)  Daugherty testified that Consolidated Precision Products has been

manufacturing large blades for years.  (*Id.* (Daugherty) at 1246.)  If he were tasked with building

a Raptor-like blade at Consolidated Precision Products, Daugherty testified he would not use

PCC trade secrets or confidential information to do so.  (*Id.* at 1246-47.)  Instead, he would rely

on Consolidated Precision Products' own established processes, equipment, materials, and data.

(*Id.*)

On March 18, 2025, Daugherty received a text from Ryan Walker, Consolidated

Precision Products' Airfoils Division President.  (*Id.* at 1217-18.)  Daugherty previously worked

with Walker at PCC.  (*Id.*)  They had maintained a friendship.  (*Id.*)  Over the next month,

Walker and Daugherty discussed the possibility of Daugherty joining Walker at Consolidated

Precision Products.  (*Id.* at 1217-21.)  While excited about the opportunity, Daugherty had

reservations.  (*Id.*)  He saw himself retiring from PCC.  (*Id.* at 1218-19.)  Daugherty was also

aware PCC may sue to prevent him from working at Consolidated Precision Products.  (*Id.* at 1219-20.)  Daugherty and his wife met with Consolidated Precision Products' CEO, James Stewart, to discuss their concerns.  (*Id.* at 1221-23.)

At Walker's suggestion, Daugherty contacted an attorney.  (*Id.* at 1220.)  A few days later, on April 15, 2025, Daugherty received a text from Walker outlining the financial terms of the offer from Consolidated Precision Products.  (*Id.* at 1260-62; Plaintiff's Exhibit 6.)  That day, Daugherty had a challenging quarterly review with PCC's CEO and COO.  (Doc. 33 (Daugherty) at 1263-64.)  After the review, Daugherty told his wife he was "done" with PCC.  (*Id.*)

On April 17, 2025, Daugherty received an employment offer from Consolidated Precision Products.  (*Id.* at 1224.)  He did not immediately accept the offer.  (*Id.* at 1225.)  Over the next several days, Daugherty had numerous follow-up questions for Walker and Consolidated Precision Products' VP of Human Resources, Tony Hanson.  (*Id.* at 1225-29.)  In the morning of April 21, 2025, Daugherty sent his resignation to PCC via email.  (*Id.* at 1229-30; Defendants' Exhibit CC.)  He was asked to leave the same day because he was leaving to work for a competitor.  (Doc. 33 (Daugherty) at 1229-30.)  That morning Daugherty returned PCC's property, including a laptop and phone.  (*Id.* at 1230-31.)  He also worked with PCC's IT manager to ensure all photos of PCC equipment and premises were removed from his iCloud account.  (*Id.* at 1231-32.)  This took several hours.  (*Id.*)

Stewart and Walker separately advised Daugherty that Consolidated Precision Products neither wanted nor needed PCC's trade secrets.  (*Id.* at 1220-23.)  They reassured Daugherty his employment was not contingent on disclosing PCC's trade secrets or confidential information.  (*Id.*)  On April 21, 2025, Daugherty signed his Consolidated Precision Products formal offer letter.  (*Id.* at 1236-37.)  The offer letter was similarly reassuring.  (*Id.* at 1237.)

In Daugherty's last full year at PCC, his compensation totaled over $600,000.  (*Id.* (Sitabkhan) at 976; *id.* (Daugherty) at 1248.)  Daugherty's compensation structure at Consolidated Precision Products features a lower base salary and bonus but includes a significant potential equity amount upon a change in control of Consolidated Precision Products.  (*Id.* (Daugherty) at 1239-40.)  Daugherty's performance metrics are largely the same and include yield, scrap rates, fostering culture, and mentoring young engineers.  (*Id.* at 1240-41.)  In his role as Director of Engineering at Consolidated Precision Products, Daugherty mentors younger engineers, helps solve engineering problems, improves manufacturing processes, and works with vendors and customers.  (*Id.* at 1222, 1241, 1254, 1265-68.)

### 2. Four Documents At Issue

After Daugherty resigned from PCC, PCC investigated Daugherty's online and printing activity.  (*Id.* (Fancher) at 1080-81.)  Leslie Fancher, a senior forensic analyst with PCC, reviewed Daugherty's external e-mail activity, printing activity, and USB activity.  (*Id.* at 1081.)  Daugherty's printing history revealed four documents queued for printing in the last two days of his employment:

1. April 16, 2025, at 11:11 AM EST, spreadsheet titled "5-9000HL B2 CE Data 05192023.xlsx;"

2. April 16, 2025, at 2:34 PM EST, spreadsheet titled "47312 Cost Estimate.xlsx;"

3. April 17, 2025, at 9:38 AM EST, spreadsheet titled "47312 Cost Estimate.xlsx;" and

4. April 17, 2025, at 9:48 AM EST, spreadsheet titled "Mentor EIS Scrap 2025 Q1 (version 1).xlsb.xlsx.[2]

---

[2] Fancher and Vaughn confirmed these are the actual times the documents were queued for printing.  (Doc. 33 (Fancher) at 1084; *id.* (Vaughn) at 1131.)

(*Id.* at 1083-87; *id.* (Vaughn) at 1133-34; Plaintiff's Exhibit 3.)  Documents two and three are duplicates.  (Doc. 33 (Fancher) at 1083-87.)  These four documents consist of cost estimates for two IGT blade models and a related scrap report.  (*Id.* (AbouAbdallah) at 1175-83.)  The four documents contain confidential and trade secret information.  (*Id.* (Polen) at 1037-43.)

### 3.     PCC's Witnesses

*Leslie Fancher.*  On April 21, 2025, Fancher conducted the initial investigation of Daugherty's computer activity.  (*Id.* (Fancher) at 1080-81.)  Fancher found no unusual USB activity and no unusual email activity.  (*Id.* at 1092.)  She also determined that Daugherty did not upload any documents to an external site.  (*Id.*)  To investigate Daugherty's printing activity, she used a tool called DTEX, which is a third-party insider threat tool that looks at a user's activity.  (*Id.* at 1081-82.)  Fancher generated a DTEX log of Daugherty's computer activity during the last 60 days of his employment.  (*Id.* at 1098.)  She also ran a Sysmon report, which pulled system information from Daugherty's computer.  (*Id.* at 1081-82, 1098.)  The Sysmon report went back 30 days.  (*Id.*)  Fancher generated a Sysmon log to show instances where Daugherty initiated a print job.  (*Id.* at 1083-85.)  She searched for the "splow" command, which is the print command.  (*Id.* at 1084-85.)  The four documents at issue appear on the Sysmon log for April 16, 2025, and April 17, 2025, with the "splow" path and an "Event ID 1."  (*Id.* at 1083-87.)  Fancher admitted the four documents at issue do not appear on the DTEX log.  (*Id.* at 1103.)  Her explanation for the discrepancy between the Sysmon and DTEX logs is that they are two different tools for pulling different sets of data.  (*Id.* at 1107, 1109-10.)  To her, both are accurate.  (*Id.*)

Fancher explained how print jobs can be initiated in different ways: hitting "Ctrl-P," right clicking and hitting print, or print preview.  (*Id.* at 1087.)  However, Fancher does not believe a

print preview occurred because the log did not show "Event ID 7," which she believes is typical for a print preview.  (*Id.* at 1087-88, 1100.)  Instead, the log showed "Event ID 1."  (*Id.*)  Based on the Sysmon log, Fancher determined that Daugherty initiated printing the four documents at issue.  (*Id.* at 1085-87, 1089.)  Fancher did not analyze the physical printer.  (*Id.* at 1111-12.) She neither pulled nor reviewed any log of the printer's activity.  (*Id.*)  Fancher could not conclusively state whether the documents were printed.  (*Id.* at 1112, 1120.)  That said, she believes the documents were printed based on her review of the logs.  (*Id.* at 1112, 1121.)

*James Vaughn*.  PCC retained James Vaughn, iDiscovery Solutions Digital Forensics Examiner, to review Daugherty's computer activity.  (*Id.* (Vaughn) at 1124.)  Vaughn has been a digital forensics examiner for the last twenty-five years.  (*Id.* at 1122.)  Vaughn was designated as an expert.  (*Id.* at 1124.)  As part of his investigation here, Vaughn generated an activity list of Daugherty's computer activity.  (*Id.* at 1125-26.)  He reviewed the same materials Fancher generated during her investigation.  (*Id.* at 1126-27.)  This included the Sysmon log identifying the four documents.  (*Id.*)  Vaughn discussed the different possibilities for print entries, including a print, a failed or cancelled print, or a print preview.  (*Id.* at 1129.)  He also discussed the possibility of a background process.  (*Id.*)  Vaughn ruled out the background process because the logs show the four documents were opened contemporaneously with the print command being initiated.  (*Id.* at 1129, 1131-34.)  He further explained the "splow" command must be initiated through a print request.  (*Id.* at 1129.)  Vaughn did not believe there was a discrepancy between the Sysmon and DTEX logs.  (*Id.* at 1128.)  He acknowledged the four documents do not appear on the DTEX log.  (*Id.* at 1139.)  To Vaughn, they are two different systems that recorded different things, and both are reliable.  (*Id.* at 1128-30, 1135-36.)

Based on his assessment, Vaughn believes Daugherty either printed the documents or initiated a print preview he then cancelled.  (*Id.* at 1134-35.)  Vaughn did not examine the printer at issue.  (*Id.* at 1136.)  He could not say whether the printer was set up to record print jobs.  (*Id.* at 1137.)  If the printer was set up for network printing, it is possible it could have recorded print jobs.  (*Id.* at 1137-38.)  Vaughn agreed he could not know whether paper physically came out of the printer.  (*Id.* at 1139-40.)

*Salim Sitabkhan*.  Sitabkhan, PCC's Vice President of Operations, worked with Daugherty for over fifteen years.  (*Id.* (Sitabkhan) at 963.)  Sitabkhan described Daugherty as a talented engineer who was skilled at using data to solve engineering problems and improve manufacturing processes.  (*Id.*)  Sitabkhan believed Daugherty was professional, honest, and ethical.  (*Id.* at 999.)  He also testified that Daugherty obtained and developed trade secret and confidential information for PCC.  (*Id.* at 964, 974-76.)

*Brent Polen*.  As PCC's Director of Technology, Polen explained that engineering improvements could be made to manufacturing processes without using a competitor's trade secrets.  (*Id.* (Polen) at 1052-58.)  By way of example, Polen recalled a project where he and Daugherty were asked to resolve a scrap problem at another PCC facility.  (*Id.*)  Polen and Daugherty collaborated with John Nichols.  (*Id.*)  Nichols previously worked at Consolidated Precision Products as well as another competitor.  (*Id.*)  Nichols assisted them without disclosing any competitor's trade secret information.  (*Id.*)  PCC does not seek to obtain trade secret information of its competitors.  (*Id.*)

Polen was aware of and assisted with PCC's review of Daugherty's activities during those final days of employment.  (*Id.* at 1063.)  In support of PCC's Renewed Motion for

Preliminary Injunction, Polen submitted a declaration. (*Id.*; Doc. 15-2; Defendants' Exhibit C.)

In it, Polen declared in pertinent part:

> I have reviewed the 30-day Access Print Log and 60-day Print Activity Log attached to the Declaration of Leslie Fancher . . . .
>
> The 60-day Print Activity Log reflects that Daugherty printed infrequently, and that, prior to April 16, when he did print, it was (or at least appears to be) in connection with work he was performing as part of his job. For example, the printouts on April 14 and 15, 2025, were for a presentation that required an overhead projector. . . .
>
> There was no legitimate business reason for Daugherty to be printing [the] four documents on the Wednesday and Thursday before his resignation, especially when he was on vacation for the final two days of employment. Indeed, Daugherty was on vacation on April 17 and 18, 2025, yet according to the attached facilities access logs . . . , Daugherty came in during his vacation to print these documents.
>
> . . . I am not aware of Daugherty returning any of the documents that he printed at the end of his employment or otherwise leaving them with PCC. . . .
>
> Before signing this declaration, I was provided a full opportunity to carefully review this declaration and freely make any corrections and additions of any kind.

(Doc. 15-2 at 318-22; Defendants' Ex. C at ¶¶ 4-5, 9-11.)

At the evidentiary hearing, Polen admitted his declaration contained inaccurate information. (Doc. 33 (Polen) at 1070-75.) Daugherty was not on vacation on April 16. (*Id.* at 1072.) Daugherty was in the office on April 16, per his usual work schedule. Daugherty was in the office on April 17 for a half day, leaving in the afternoon on April 17 for a scheduled vacation.[3] (*Id.*) When pressed, Polen's explanation for this discrepancy was that he was told "in passing" that Daugherty was on vacation. (*Id.* at 1073.) Polen acknowledged conducting no

---

[3] Daugherty's leave request for a half-day of vacation on April 17 was submitted approximately two weeks in advance, so early April 2025. (*Id.* at 1075.)

separate inquiry or making any effort to clarify Daugherty's work schedule prior to submitting his declaration. (*Id.* at 1074.) Polen does not know if Daugherty printed any of the four documents at issue. (*Id.* at 1075.)

### 4. Defendants' Witnesses

*Jonathan Edwards*. Jonathan Edwards, a Senior Forensic Investigator with Avalon Legal, reviewed Daugherty's printing activity. (*Id.* (Edwards) at 1147.)[4] He reviewed Fancher's logs as well as Vaughn's activity list. (*Id.* at 1147-48, 1150.) Edwards explained that the Sysmon tool monitors the computer operating system. (*Id.* at 1150.) An "Event ID 1" signifies a new process is being initiated. (*Id.* at 1152.) Spooling is the first step of the printing process. (*Id.* at 1155, 1166-67.) Edwards agreed with Vaughn that the spool process for the documents on the Sysmon log could have been initiated through only one of three possibilities: printing; a print preview; or a cancelled print. (*Id.* at 1156, 1166.) He also agreed it was unlikely the spool process was initiated by a background process, meaning "Event ID 1" requires manual implementation of a print action. (*Id.* at 1156.) In contrast to Fancher's testimony, Edwards stated an "Event ID 7" has absolutely nothing to do with printing or print preview. (*Id.* at 1157-58.)

Edwards did not have an opinion whether the Sysmon or DTEX log was superior. (*Id.* at 1159.) Both logs provide useful information, but neither tool conclusively determines whether documents were printed. (*Id.* at 1164-65.) To him, the inconsistency between the Sysmon and DTEX logs should have prompted an examination of the actual printer. (*Id.* at 1159-60.) Depending on how the printer was set up, the printer could have revealed whether these

---

[4] Edwards has testified as an expert over fifty times in the last ten years. (*Id.* at 1145.)

documents were actually printed.  (*Id.* at 1160.)  He cannot say whether these documents were printed on April 16 or April 17.  (*Id.* at 1164-65.)

*Chady AbouAbdallah*.  AbouAbdallah is the Sales Manager at PCC Mentor.  Daugherty managed AbouAbdallah for eight years before AbouAbdallah moved to the sales team.  (*Id.* (AbouAbdallah) at 1172.)  He viewed Daugherty as a mentor.  (*Id.*)  AbouAbdallah described Daugherty as professional, honest, and ethical.  (*Id.*)

In the weeks leading up to Daugherty's departure, AbouAbdallah asked Daugherty to assist him in preparing for an upcoming long-term agreement ("LTA") negotiation with Siemens.[5]  (*Id.* at 1175-78.)  The meeting with Siemens was scheduled for April 22, 2025.  (*Id.*)  AbouAbdallah specifically requested Daugherty review cost estimates for IGT blades.  (*Id.*)  On April 15, 2025, AbouAbdallah received cost estimates that were surprisingly high.  (*Id.* at 1179-81.)  He tried to speak with Daugherty, but Daugherty was in a quarterly review.  (*Id.*)  Emails concerning cost estimates were exchanged.  (*Id.*)  On April 15 and 16, 2025, AbouAbdallah, Daugherty, and others emailed about the cost estimates.  (*Id.*; *see also* Defendants' Exhibit W.)  On the morning of April 17, 2025, AbouAbdallah, Daugherty, and others received the updated cost estimates.  (Doc. 33 (AbouAbdallah) at 1181-82; *see also* Defendants' Exhibit X.)  AbouAbdallah explained that his request for Daughtery's assistance necessitated Daugherty's review of cost estimate records.  (Doc. 33 (AbouAbdallah) at 1182.)

*Daugherty*.  Daugherty acknowledged viewing the four documents at issue to prepare AbouAbdallah for the LTA negotiation with Siemens.  (*Id.* (Daugherty) at 1233-35.)  Daugherty spoke with AbouAbdallah about cost estimates on April 16 or 17, 2025.  (*Id.* at 1233-34.)

---

[5] AbouAbdallah could not recall the exact date on which he asked Daugherty for assistance.  (*Id.* at 1183.)

Although there was only email traffic about the cost estimates for one of the blades, Daugherty recalled reviewing the estimates for the other blade. (*Id.* at 1234-35.) He explained how Siemens previously requested a quote for the other blade. (*Id.*) Daugherty wanted AbouAbdallah to be prepared if Siemens restated its request for information about the other blade during the upcoming meeting. (*Id.* at 1235.)

Daugherty did not believe he clicked either "print" or "print preview" for any of the four documents at issue. (*Id.* at 1232-36, 1268-69.) He never retrieved printed copies of any of the four documents from any printer. (*Id.*) He did not leave PCC with copies of these documents. (*Id.*) He does not have any of these documents. (*Id.*)

As to PCC trade secrets and his continued employment at Consolidated Precision Products, Daugherty explained his ability to work with, advise, and direct Consolidated Precision Products' employees in the development of its own IGT blades without disclosing PCC trade secrets. (*Id.* at 1246-47, 1252-54, 1267-68.) Daugherty also explained that working with others at Consolidated Precision Products would involve utilizing Consolidated Precision Products' data, materials, and processes. (*Id.*) Daugherty has not and will not disclose any PCC trade secrets to Consolidated Precision Products. (*Id.*)

### 5. Fancher's Supplemental Declaration

Following the hearing, PCC submitted—without leave to do so—a supplemental declaration from Fancher with additional information about Daugherty's assigned printer. (*See* Docs. 36, 36-1.) Defendants moved to strike the supplemental declaration (Doc. 37), and PCC opposed (Doc. 38).

During the evidentiary hearing, the Court asked Vaughn to explain whether Daugherty's printer recorded completed print jobs, meaning would it reveal if the documents at issue were

printed.  (Doc. 33 (Vaughn) at 1136-37.)  Vaughn could not speak to that.  (*Id.*)  He did not examine the printer.  (*Id.* at 1137.)  No witness did, at least not during the time period for doing so.  (*Id.*; Doc. 38 at 1323-24.)  That appears to be the reason PCC now seeks to present Fancher's post-hearing declaration.

PCC investigated Daugherty's printing activity before commencing this lawsuit.  For reasons known only to PCC, it did not examine the printer itself.  (Doc. 38 at 1323-24.)  The Court provided PCC with ample time to conduct pre-hearing discovery.  (*See* May 8, 2025 Minute Order.)  PCC also submitted supplemental briefing in advance of the evidentiary hearing.  (*See* Doc. 28.)  At the evidentiary hearing, Fancher testified.  When PCC heard its expert witness explain he did not examine the printer and did not know if it recorded print jobs, PCC could have sought to recall Fancher on this point.  It did not.  According to PCC, it could not recall Fancher because she had never examined the printer.  (Doc. 38 at 1323-24.)

PCC's effort to submit evidence about Daugherty's printer comes too late.  And PCC's offer to make Fancher available for a limited deposition misses the point.  (*Id.* at 1324-25.)  PCC had sufficient time and opportunity to present evidence.  That time passed.  PCC has offered no just reason for reopening the presentation of evidence in any form.  PCC has simply provided no explanation for why this information was not presented in pre-hearing submissions or during the hearing itself.  Allowing PCC to unilaterally extend the timeline for submitting evidence undermines the adversarial process and disregards this Court's scheduling order.  For these reasons, the Court will not consider Fancher's supplemental declaration.  Accordingly, Defendants' Motion to Strike the Supplemental Declaration of Leslie Fancher is DENIED as moot.[6]

---

[6] Even if the Court were to consider Fancher's supplemental declaration, it does not change the

### B. Procedural History

On May 6, 2025, PCC filed a Verified Complaint against Daugherty and Consolidated Precision Products.  (Doc. 1.)  PCC asserts three claims: (1) Breach of Contract (against Daugherty); (2) Misappropriation of Trade Secrets in Violation of Ohio Rev. Code § 1333.61, *et seq.* (against all defendants); and (3) Misappropriation of Trade Secrets in Violation of 18 U.S.C. § 1836, *et seq.* (against all defendants).  (*Id.*)

Also on May 6, 2025, PCC filed a Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing.  (Doc. 2.)  PCC asserts it is entitled to injunctive relief on its claim for threatened trade secret misappropriation and breach of the confidentiality provisions in Daugherty's Agreement.  (*Id.* at 71-79.)  The motion requests a temporary restraining order, and then a preliminary injunction restraining Daugherty and Consolidated Precision Products from disclosing PCC's trade secrets, restraining Daugherty from providing services to Consolidated Precision Products related to IGT casting, and restraining Daugherty from disclosing or otherwise using PCC's trade secrets in violation of his contractual obligations.  (*Id.* at 65-66.)

On May 8, 2025, the Court conducted a telephonic status conference with the parties. (*See* May 8, 2025 Minute Order.)  The Court denied PCC's request for a temporary restraining order because PCC did not present sufficient evidence of a likelihood of success on the merits. The Court determined an evidentiary hearing was necessary and set deadlines for expedited discovery and supplemental briefing.  (*See id.*)

On May 20, 2025, Defendants jointly opposed PCC's Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing.  (Doc. 11.)

---

fact that PCC cannot show Daugherty printed the documents or removed them from PCC.

On June 2, 2025, PCC filed a Renewed Motion for Preliminary Injunction, claiming discovery revealed on Daugherty's final days at PCC, he reviewed, printed, and stole PCC trade secret information.  (Doc. 15.)  The Renewed Motion added a claim for actual trade secret misappropriation in addition to the claims for threatened trade secret misappropriation and breach of the Agreement.  (*Id.* at 237-48.)  On June 4, 2025, the Court conducted another telephonic status conference with the parties to address the new allegations.  (*See* June 4, 2025 Minute Order.)  On June 16, 2025, Defendants jointly opposed PCC's renewed motion.  (Doc. 22.)  The parties later filed supplemental briefs.  (Docs. 28, 29.)

On July 31, 2025, the Court held an evidentiary hearing.  (*See* Doc. 33.)  On August 13, 2025, the parties separately filed Proposed Findings of Fact and Conclusions of Law.  (Docs. 34, 35.)  The Court denied PCC's request for a preliminary injunction (Doc. 39), and PCC timely appealed.  On May 19, 2026, the Sixth Circuit reversed and remanded this Court's Order, directing that each of the preliminary injunction factors be weighed on a sliding scale and relief granted "only if [the] plaintiff has made 'a clear showing that [it] is entitled to such relief.'" *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 513 (6th Cir. 2026) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)).  On June 10, 2026, the mandate issued.  (Doc. 48.)

## II.  LAW AND ANALYSIS

### A.  Standard of Review

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted).

When considering a motion for preliminary injunction, the Court must consider four factors: (1) the movant's likelihood of success on the merits; (2) the risk of irreparable harm to

the movant without an injunction; (3) harm to others; and (4) the broader public interest.  *Winter*, 555 U.S. at 20; *A1 Diabetes & Med. Supply v. Azar*, 937 F.3d 613, 618 (6th Cir. 2019); *see also Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). These factors are "not prerequisites to be met."  *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (citing *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 542); *see also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579-80, 137 S. Ct. 2080, 198 L. Ed. 2d 643 (2017) (per curiam) (the sliding-scale inquiry turns "as much on the equities of a given case as the substance of the legal issues it presents"). After considering each factor, the Court may grant a preliminary injunction only if the movant has made "a clear showing that [it] is entitled to such relief."  *Winter*, 555 U.S. at 22 (citation omitted).  While "no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citation omitted); *see also Fetch! Pet Care, Inc. v. Atomic Pawz Inc.*, 170 F.4th 546, 558 (6th Cir. 2026).  Failure to demonstrate irreparable injury is always fatal.  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

A "court's resolution of issues in a preliminary injunction order is never binding on a case's underlying merits." *Mktg. Displays Int'l v. Shaw*, 93 F.4th 967, 971-72 (6th Cir. 2024). "Findings made in the course of deciding whether to issue a preliminary injunction . . . generally do not establish the law of the case . . . ." *Grudzinski v. Staren*, 87 F. App'x 508, 512 (6th Cir. 2004); *see also Harris v. Fitchville Twp. Trs.*, 154 F. Supp. 2d 1182, 1186-87 (N.D. Ohio 2001) ("The Sixth Circuit has held that determinations made in the process of deciding a motion for preliminary injunction are not binding in a resolution on the merits.") (citation omitted).

### B. Likelihood of Success on the Merits

PCC alleges actual misappropriation and threatened misappropriation of PCC's trade secrets in violation of the Ohio Uniform Trade Secrets Act ("OUTSA") and the Defend Trade Secrets Act ("DTSA"). (Doc. 15 at 237.) The requirements for establishing misappropriation of trade secrets are largely the same under Ohio and federal law, so the Court will analyze these claims together in considering likelihood of success on the merits. *See James B. Oswald Co. v. Neate*, 98 F.4th 666, 675 (6th Cir. 2024) (considering OUTSA and DTSA claim together); *see also Union Home Mortg. Corp. v. Fratelli*, No. 1:23-CV-857, 2025 WL 639315, at *4, 2025 U.S. Dist. LEXIS 35673 (N.D. Ohio Feb. 27, 2025) (citations omitted).

To prevail on a misappropriation of trade secrets claim under Ohio law, a plaintiff must prove: "(1) the existence of a trade secret; (2) acquisition of the trade secret as the result of a confidential relationship or through improper means; and (3) an unauthorized use of the trade secret." *Novus Grp., LLC v. Prudential Fin., Inc.*, 74 F.4th 424, 427-28 (6th Cir. 2023) (citing *Tomaydo-Tomahhdo L.L.C. v. Vozary*, 82 N.E.3d 1180, 1184 (Ohio Ct. App. 2017) and Ohio Rev. Code § 1333.61(B)(1)). "To prevail on a claim under the DTSA, a plaintiff must show: (1) the existence of a protectable trade secret; (2) misappropriation of the trade secret by the defendant; and (3) that the trade secret is related to a product or service used in interstate commerce." *Endless River Techs. LLC v. Trans Union LLC*, No. 1:18-CV-00936, 2022 WL 314598, at *9, 2022 U.S. Dist. LEXIS 19217 (N.D. Ohio Feb. 2, 2022); 18 U.S.C. § 1836.

#### 1. Trade Secret

A "trade secret" is information that (1) "derives independent economic value . . . from not being generally known to . . . other persons" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ohio Rev. Code § 1333.61(D); 18 U.S.C. § 1839(3).

For purposes of evaluating the instant motions, PCC has demonstrated the existence of a protectable trade secret.  The parties acknowledge PCC's SOPs and its IGT manufacturing process contain trade secrets.  (Doc. 33 (Sitabkhan) at 964-74; *id.* (Polen) at 1033, 1037-38; *id.* (Daugherty) at 1202, 1249-51; Doc. 34 at 1281, 1283; Doc. 35 at 1298.)  The parties also acknowledge the four documents queued for printing contain trade secrets.  (Doc. 33 (Polen) at 1037-43; *id.* (Daugherty) at 1269; Doc. 34 at 1286-87; Doc. 35 at 1301-02, 1305.)  PCC's pricing information is also an undisputed trade secret.  (Doc. 33 (Sitabkhan) at 974; *id.* (Polen) at 1037-38; *id.* (Daugherty) at 1251; Doc. 35 at 1298.)

### 2.     Misappropriation or Acquisition

PCC must show its trade secrets were obtained (by way of a relationship or improper means) and used without authorization.  *See Handel's Enters., Inc. v. Schulenburg,* 765 F. App'x 117, 122 (6th Cir. 2019).  PCC asserts it is likely to prevail on its claim for actual trade secret misappropriation because Daugherty—in his final days of employment—likely printed and kept four documents containing trade secrets.  (*See* Doc. 35 at 1304.)

PCC relies heavily on printing logs.  Fancher generated a Sysmon log to show instances where Daugherty initiated a print job.  (Doc. 33 (Fancher) at 1081-85.)  The four documents at issue appear on the Sysmon log for April 16, 2025, and April 17, 2025.  (*Id.* at 1083-87.)  Based on the Sysmon log, Fancher believes Daugherty initiated printing the four documents at issue.  (*Id.* at 1085-87, 1089, 1112, 1121.)  Vaughn also reviewed Daugherty's printing activity.  (*Id.* (Vaughn) at 1125-27.)  He believes Daugherty either printed the documents or did a print preview and then cancelled it.  (*Id.* at 1134-35.)  Neither Fancher nor Vaughn could say whether the documents were actually printed, let alone removed from PCC's offices.  (*Id.* (Fancher) at

1112, 1120; *id.* (Vaughn) at 1139-40.)  While credible as witnesses, their testimony is limited and does little more than direct the Court to possibilities.

Notwithstanding its inability to prove the documents were printed or removed from PCC's offices, PCC asserts that "Daugherty had no legitimate business reason for accessing, much less printing, these documents" when he did.  (Doc. 35 at 1302; Doc. 33 (Polen) at 1044, 1065, 1069; *id.* (AbouAbdallah) at 1187-92.)  To PCC, these documents were typically viewed and transferred electronically—they were not printed.  (Doc. 33 (Polen) at 1044, 1065, 1069.)  The simple act of initiating a print command establishes likely misappropriation, PCC contends.

But AbouAbdallah's credible testimony contradicts this assertion.  AbouAbdallah sought Daugherty's support on a project that necessitated Daugherty's review of these documents.  (*Id.* (AbouAbdallah) at 1175-78.)  To be sure, PCC asserts Daugherty did not provide additional support to AbouAbdallah after Daugherty allegedly printed the documents.  (*Id.* at 1187-92.)  But this argument carries little weight when reviewing the timeline of events.  AbouAbdallah's presentation was set for April 22, 2025.  (*Id.* at 1175-78.)  He was speaking with and seeking help from Daugherty up until the afternoon of April 17, 2025, when Daugherty left for vacation.  (*Id.* at 1179-82.)  Daugherty credibly explained his decision to leave PCC was made the morning of April 21, 2025, and he communicated that decision to PCC the same day.  (*Id.* (Daugherty) at 1229, 1259.)  Daugherty did not provide additional support after April 17 because he was not in the office on April 18, and he promptly notified PCC of his resignation on April 21.  (*Id.* at 1224-29, 1259.)

PCC also relies on Polen.  Polen testified to inspecting Daugherty's office after Daugherty's departure and being unable to locate the four documents at issue.  (*Id.* (Polen) at 1039, 1043; Defendants' Exhibit C at ¶ 10.)  To PCC, the absence of these four documents

establishes Daugherty took them to Consolidated Precision Products.  The Court cannot make the inferential leap PCC urges.  The absence of these documents may very well be due to the fact they were not printed on April 16 or April 17.

Moreover, the Court cannot rely on Polen's testimony.  Polen submitted a declaration to the Court stating that Daugherty was in PCC's offices to print records when Daugherty was supposed to be on vacation.  (Doc. 33 (Polen) at 1070-75; Defendants' Exhibit C at ¶ 9.)  To PCC, this establishes nefarious intent.  But Polen now admits he did nothing more than rely on a colleague's "passing" statement when he attested to Daugherty's vacation schedule as fact.  (Doc. 33 (Polen) at 1070-75.)  He also acknowledged Daugherty's presence in PCC's offices on April 16 and half the day on April 17 was both known to PCC and consistent with Daugherty's work schedule.  (*Id.*)

Not surprisingly, Defendants contend PCC failed to demonstrate misappropriation, largely because there is no actual proof of misappropriation and because Daugherty was a credible witness.  Daugherty denied printing the records, removing the records, and disclosing PCC's trade secrets or confidential information.  (*Id.* (Daugherty) at 1232-36, 1268-69.)

The Court finds Daugherty to be a credible witness on all of these points.  First, the Court observed the manner in which Daugherty answered questions.  His responses were clear, patient, and detailed.  He was not evasive.  He unequivocally stated he could work for Consolidated Precision Products while maintaining his ethical and legal obligations to PCC.  (*Id.* at 1246-47, 1252-54, 1267-68.)  Daugherty's testimony was corroborated by PCC's witnesses.  Daugherty is widely respected by his peers.  (*Id.* (Sitabkhan) at 999; *id.* (AbouAbdallah) at 1172.)  Sitabkhan and AbouAbdallah firmly believe Daugherty is ethical.  (*Id.*)  Daugherty's explanation for viewing the documents at issue was corroborated by AbouAbdallah's testimony and the emails

discussing the cost estimate concerns.  (*Id.* (AbouAbdallah) at 1175-78, 1181-82; Defendants'

Exhibit W; Defendants' Exhibit X.)  PCC has not established that any of the four documents at

issue were printed, let alone removed from PCC's offices.  It has also not established that

Daugherty disclosed any of its trade secrets.

### 3.      Inevitable Disclosure Doctrine

Without evidence of actual misappropriation, PCC relies on the "inevitable disclosure

doctrine" to support its claim for threatened misappropriation.  *See Procter & Gamble Co. v.*

*Stoneham*, 140 Ohio App.3d 260, 747 N.E.2d 268, 278-79 (Ohio Ct. App. 2000).  Under the

inevitable disclosure doctrine, "a threat of harm warranting injunctive relief can be shown by

facts establishing that an employee with detailed and comprehensive knowledge of an

employer's trade secrets . . . has begun employment with a competitor . . . in a position that is

substantially similar . . . ."  *Id.* at 279.

The parties present vastly different positions on the applicability of the inevitable

disclosure doctrine.  PCC asserts the doctrine can be applied in any situation where a former

employee with detailed knowledge of trade secrets seeks a similar position with a competitor.

(*See* Doc. 35 at 1306.)  Defendants assert something different.  (*See* Doc. 34 at 1291.)  To them,

the case law reveals courts considering the inevitable disclosure doctrine first look to whether

there is a non-compete agreement.  Absent a non-compete agreement, courts require proof of

"significant wrongdoing" or evidence that employee did not act "above board."  (*Id.* (citation

omitted).)

The Court has reviewed inevitable disclosure doctrine case law in Ohio and the Sixth

Circuit.  Ohio courts generally do not apply the inevitable disclosure doctrine without a valid

non-compete agreement.  *See Hydrofarm, Inc. v. Orendorff*, 180 Ohio App.3d 339, 905 N.E.2d

658, 663 (Ohio Ct. App. 2008); *SkfUSA, Inc. v. Zarwasch-Weiss*, No. 10-cv-1548, 2011 WL 13362617, at *31 n.39, 2011 U.S. Dist. LEXIS 167027 (N.D. Ohio Feb. 3, 2011).  District courts in this circuit take a slightly different approach.  A review of district court opinions reveals the application of the inevitable disclosure doctrine in the absence of a valid non-compete agreement only when there is evidence of dishonesty, bad faith, nefarious conduct, or an intent to misappropriate.  *See A&P Tech., Inc. v. Lariviere*, No. 17-cv-534, 2017 WL 6606961, at *5, 2017 U.S. Dist. LEXIS 211822 (S.D. Ohio Dec. 27, 2017); *compare Devicor Med. Prods., Inc. V. Reed*, No. 11-cv-645, 2013 WL 1315037, 2013 U.S. Dist. LEXIS 45730 (S.D. Ohio Mar. 29, 2013) (denying preliminary injunction where no evidence of improper solicitation or attempt to divert business) and *Cleverland Holdings, LLC v. Mahan*, No. 23-cv-01571, 2023 WL 8039513, 2023 U.S. Dist. LEXIS 207538 (N.D. Ohio Oct. 10, 2023), R&R adopted, 2023 WL 8019083, 2023 U.S. Dist. LEXIS 206994 (N.D. Ohio Nov. 20, 2023) (denying injunctive relief where plaintiff failed to put forth either direct or circumstantial evidence of misappropriation of any asset), *with Union Home Mortg. Corp.*, 2025 WL 639315 (granting injunctive relief where plaintiff provided evidence defendant accessed plaintiff's database, compiled confidential information from the database, and uploaded it to his personal DropBox account), *Polymet Corp. v. Newman*, No. 16-cv-734, 2016 WL 4449641, 2016 U.S. Dist. LEXIS 113000 (S.D. Ohio Aug. 24, 2016) (granting injunctive relief where there was heavy circumstantial evidence defendant intended to misappropriate plaintiff's trade secrets), and *Goken Am., LLC v. Bandepalya*, No. 14-cv-1445, 2014 WL 6673830, 2014 U.S. Dist. LEXIS 164370 (S.D. Ohio Nov. 24, 2014) (granting injunction where former employee copied files onto external hard drive).

To the extent PCC relies on *Nucor Corp. v. Bell*, No. 06-CV-02972, 2008 WL 9894350, 2008 U.S. Dist. LEXIS 119952 (D.S.C. Mar. 14, 2008), that reliance is misplaced.  While *Nucor*

applied the inevitable disclosure doctrine in the absence of a non-compete agreement, there was evidence the former employee physically removed records after deciding to leave the company's employment.  2008 WL 9894350, at *15-20.  There was also evidence of "bad faith" because the former employee carelessly discarded a thumb-drive containing the company's trade secrets.  *Id.*

The Court adopts the three-step inquiry applied by other district courts in this circuit. Step one: Does the employee to be enjoined have "detailed and comprehensive knowledge of an employer's trade secrets and confidential information?"  *Procter & Gamble Co.*, 747 N.E.2d at 279.  If yes, step two: Was there a valid non-compete agreement?  If not, step three: Has the moving party presented evidence of dishonesty, bad faith, nefarious conduct, or an intent to misappropriate?  *See A&P Tech., Inc.*, 2017 WL 6606961, at *5.

Under step one, PCC directs the Court to Daugherty's extensive knowledge of PCC's IGT manufacturing process.  To PCC, Daugherty will not be able to work in IGT casting for Consolidated Precision Products without disclosing PCC trade secret information.  Consolidated Precision Products does not dispute that Daugherty is knowledgeable about IGT casting. Instead, they highlight their own consistent statements to Daugherty that he is not to disclose any of PCC's trade secrets.  The Court finds Daugherty had and may still recall confidential and trade secret information.

Moving to step two, the parties all acknowledge that Daugherty and PCC never entered into a non-compete agreement.  So the Court moves to step three and considers whether there is evidence of dishonesty, bad faith, nefarious conduct, or an intent to misappropriate.  In short, the answer is no.

Daugherty had a legitimate business reason to view the four documents at issue.  There is no evidence those documents were printed in the days leading up to Daugherty's departure from

PCC.  At best, there is evidence he could have printed them, but given the legitimate reason Daugherty had for viewing the records, the possibility of printing is insufficient to demonstrate bad faith, nefarious conduct, or an intent to misappropriate PCC's information.

Similarly, there is no evidence Daugherty took those records, or any other records, to Consolidated Precision Products.  And Polen's claim that Daugherty came into PCC's offices while on vacation to print these records has been disproven.  Instead, what has been established is that PCC's employees, including Sitabkhan and AbouAbdallah, believe Daugherty to be honest and ethical.  For his part, Daugherty explained he could support Consolidated Precision Product's IGT casting efforts without relying on PCC trade secrets, namely because he would be using Consolidated Precision Product's materials, processes, and data.  Daugherty credibly stated he can and will maintain his own ethical standards and comply with his legal obligations to PCC.

### 4. Breach of Contract

"An Ohio breach of contract claim has four elements: the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff."  *New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 520 (6th Cir. 2022) (quotations and citations omitted).

For the reasons discussed above, PCC has not demonstrated a likelihood that Daugherty breached sections 2 or 3 of the Agreement, or that his employment with Consolidated Precision Products would necessarily force him to breach his agreement.  PCC has not presented evidence Daugherty stole PCC's trade secret information in his final days of employment nor that he disclosed trade secrets to Consolidated Precision Products.  PCC also has not shown an imminent threat of disclosure of its trade secrets.

**5.**     **Finding as to Likelihood of Success on the Merits**

"[T]he likelihood of success on the merits factor is 'generally the most important factor of a preliminary injunction analysis.'" *Shepler's Inc. v. City of Mackinac Island*, No. 25-1668, 2026 WL 700482, at *3, 2026 US App LEXIS 7560 (6th Cir. Mar. 12, 2026) (quoting *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024)); *see also S. Glazer's Distribs.*, 860 F.3d at 849 ("[A] preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.") (citations and quotations omitted).  For these reasons, PCC has not demonstrated its likelihood of success on the merits.  "When one factor is dispositive, a district court need not consider the others."  *D.T.*, 942 F.3d at 327. Notwithstanding, the Court will assess the three remaining factors.

**C.**     **Irreparable Injury**

This factor "is indispensable: [i]f the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit."  *Id.* (citation omitted).  Irreparable injury "must be both certain and immediate, not speculative or theoretical." *Id.*  An injury is irreparable if it cannot be fully compensated by monetary damages.  *Overstreet*, 305 F.3d at 578.

PCC argues that courts routinely find irreparable injury in threatened trade secret misappropriation cases.  (*See* Doc. 35 at 1310.)  To be sure, the Sixth Circuit has recognized the speculative nature of trade secret injuries may make such injuries irreparable.  *Fetch!*, 170 F.4th at 558.  Nevertheless, the Court must still consider the evidence before it to ascertain whether "'irreparable injury is *likely* in the absence of an injunction.'"  *Id.* (quoting *Winter*, 555 U.S. at 22 (emphasis in original).)

Such a showing has not been made here, largely because PCC's own employees attested to Daugherty's character and ethical nature.  (Doc. 33 (Sitabkhan) at 999; *id.* (AbouAbdallah) at

1172.)  Such testimony undercuts the argument that any threat of trade secret disclosures is imminent.  Moreover, Daugherty credibly testified he would not need to rely on PCC's trade secret information to perform IGT work at Consolidated Precision Products because Consolidated Precision Products' own processes, equipment, materials, and data would necessarily be the foundation for his decision-making processes.  (*Id.* (Daugherty) at 1246-47.)  And as a final but notable point, other high-level engineers have transferred between PCC and Consolidated Precision Products with no apparent harm to PCC after such employees accepted positions at Consolidated Precision Products.  (*Id.* (Daugherty) at 1205-07, 1255-57; *id.* (Polen) at 1052-58.)

At best, PCC has demonstrated the *possibility* of an irreparable injury.  This is not sufficient.  *Garlock, Inc. v. United Seal, Inc*., 404 F.2d 256, 257 (6th Cir. 1968).[7]

### D.      Harm to Others

In evaluating this factor, the Court must consider "'whether the issuance of the injunction would cause substantial harm to others.'"  *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 550-51 (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  More specifically, the Court must assess "whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by the party seeking the injunction."  *Extracorporeal All., L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1045 (N.D. Ohio 2003), *aff'd*, 113 F. App'x 98 (6th Cir. 2004) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

---

[7] Even if this factor weighed in PCC's favor, the Court does not find that all factors, when taken together, clearly show PCC is entitled to injunctive relief.  *See Winter*, 555 U.S. at 22-24; *D.T.*, 942 F.3d at 326-27.

PCC urges that its requested injunction "will result in minimal (if any) harm to Defendants" because Daugherty is not currently working in IGT casting and has enough work to do at other Consolidated Precision Products facilities.  (*See* Doc. 35 at 1311.)  To Defendants, an injunction preventing Daugherty from working on IGT casting would harm Daugherty's livelihood, his financial stability, his professional reputation, and disrupt Consolidated Precision Products' business operations.  (*See* Doc. 34 at 1293.)  On this point, it appears that few will feel the effect of the requested injunction, and those who would be constrained by it can pursue Consolidate Precision Products' many other endeavors or remain assigned to IGT while this matter is resolved.

### E.  Public Interest

Finally, the public interest will not be served by granting PCC's requested injunctive relief.  Restraining Daugherty from directly or indirectly providing IGT casting services to Consolidated Precision Products would give PCC the benefit of a non-compete agreement it did not negotiate for and for which Daugherty was not compensated.  To do so "would be endorsing the proposition that any employee with specialized knowledge that agreed not to disclose that knowledge can be forbidden from working for a direct competitor indefinitely.  Such a proposition would undermine the 'strong public interest in fair and free competition.'"  *A&P Tech., Inc.*, 2017 WL 6606961, at *7 (quoting *Bailey v. Chattem, Inc.*, 684 F.2d 386, 391 (6th Cir. 1982)).

### III.  CONCLUSION

To grant injunctive relief, the Court must find that all four factors, taken together, clearly weigh in favor of such relief.  *See Winter*, 555 U.S. at 22-24; *Daugherty*, 176 F.4th at 513-15.  Because PCC has not made the requisite showing, preliminary injunctive relief is DENIED.

Defendants' Motion to Strike is DENIED as moot.


   **IT IS SO ORDERED.**


**Date:**  June 17, 2026                    _____
                                            BRIDGET MEEHAN BRENNAN
                                            UNITED STATES DISTRICT JUDGE